**Ace Pilot Training v. Caufman**

C.P. of Lehigh County, no. 2007-C-1510.

*Frederick J. Lanshe,* for plaintiff.

*Gladys E. Wiles and Galen D. Hawkon,* for defendants.

FORD, *J.,* November 30, 2010—Plaintiff, Ace Pilot Training, Inc., was the lessee of a 1973 Piper Cherokee aircraft that crashed on May 13, 2005. In plaintiff's amended complaint filed on December 14, 2007, plaintiff claims that the aircraft experienced engine power loss and crashed because the tailpipe in the aircraft's exhaust system had been improperly installed by defendants, James Caufman and Slatington Aircraft Repair, LLC. Although occupants of the aircraft were injured in the crash, this is a lawsuit for property damage only.

The claims stated in the amended complaint are count I, breach of warranty, against James Caufman; count II, negligence against James Caufman; count III, breach of warranty against Slatington Aircraft Repair, LLC; and count IV, negligence against Slatington Aircraft Repair, LLC.

On February 7, 2008, the defendants filed a joinder complaint against additional defendants, Kent Heller, and Heller Aero Service, Inc.. The joinder complaint also names Heller Aero Service and Helger Aero Service, Inc. as parties but no evidence was presented at trial against such entities. The joinder complaint filed by the defendants against the additional defendants is brought under Pa.R.C.P.2252. It requests judgment in favor of defendants "and against additional defendants, for sole liability and/ or joint and several liability and indemnification and contribution."

A bench trial was conducted before the undersigned

on September 20 and September 22, 2010. At the trial, plaintiff sought a verdict in its favor in the amount of $45,398 for property damage, costs of suit, interest, and attorney's fees.

Each claim brought by the plaintiff in the amended complaint is based upon plaintiff's ability to prove that the crash was caused by the improper installation of the tailpipe. Because plaintiff has failed to prove that the installation of the tailpipe caused the crash, I enter a verdict today against plaintiff and in favor of the defendants and the additional defendants. The reasons for this verdict are explained in this opinion.

### Findings of Fact

1. Plaintiff, Ace Pilot Training, Inc., is a Pennsylvania corporation with its business located at 600 Hayden Circle, Allentown, Lehigh County, Pennsylvania. This is on the grounds of the Lehigh Valley International Airport. Plaintiff does flight instruction and aircraft rental.

2. Plaintiff was the lessee of a 1973 Piper Cherokee aircraft, model PA-28 140, Federal Aviation Administration (FAA) registration number N55165, owned by Gus Y. Yialamas, the lessor of the aircraft. Mr. Yialamas is a shareholder and officer of plaintiff corporation. Under the terms of the lease, plaintiff, as lessee, is responsible to Mr. Yialamas, as lessor, for any damages to the aircraft.

3. Defendant, James Caufman, is an adult individual who resides at 347 North Rosetree Drive, Sublimity, Oregon. Caufman resided in Pennsylvania during all events described in these findings of fact. He performed maintenance and inspection work on various airplanes for

plaintiff for several years.

4. Defendant, Slatington Aircraft Repair, LLC, was a Pennsylvania limited liability corporation that was formed by defendant Caufman. At the time of the events described in these findings of fact, its business address was 4285 Kathi Drive, Bethlehem, Northampton County, Pennsylvania. The business of Slatington Repair was aircraft inspection and maintenance.

5. Additional defendant, Kent Heller, is an adult individual who resides at 74 Winchester Court, Reading, Berks County, Pennsylvania. He also performed airplane maintenance and inspection work for plaintiff for several years.

6. Additional defendant Heller formed additional defendant, Heller Aero Service, Inc. ("Heller Aero"), which is a Pennsylvania corporation with its business located at Limerick Airport, RD 3, Airport Road, Pottstown, Pennsylvania. Heller Aero performs airplane maintenance and inspection.

7. Caufman and Heller each had FAA airframe and powerplant certifications ("A&P"). Caufman and Heller also had FAA inspection authorization ("IA"). At various times, Caufman and Heller did maintenance and inspection work for plaintiff on this Cherokee aircraft, "signed off" the aircraft after their work as "airworthy," and returned the aircraft to service ("RTS") as safe to operate under FAA regulations

8. On September 12, 2002, defendant Caufman did maintenance on the engine of this Cherokee aircraft. In the course of doing that, defendant Caufman replaced

118

a tailpipe with a well-used muffler with an overhauled tailpipe. Defendant Caufman certified his work as airworthy and returned the aircraft to service

9. Proper installation of the tailpipe into the muffler on this aircraft requires that the tailpipe be inserted into the exhaust flange of the muffler. At the end of the tailpipe and welded to it is the safety cage. The safety cage consists of two thick, arch-shaped, criss-crossed wires that are designed to prevent materials inside the muffler from blocking or clogging the tailpipe. The blocking or clogging would prevent exhaust from leaving the muffler through the tailpipe. An item known as a baffle is attached inside an operational muffler. It reaches high temperatures when the aircraft is operating. If the baffle should become displaced, the safety cage is designed to prevent it from blocking the exhaust path provided through the tailpipe. In order for the safety cage at the end of the tailpipe to function as intended, it must be inserted in such a way that it is positioned beyond the exhaust flange inside the muffler. If the tailpipe with safety cage is positioned too low in the exhaust flange, items inside the muffler, including a displaced baffle, could block the exhaust path provided by the tailpipe. To assure that the tailpipe is not installed too low in the exhaust flange, installers usually place the tailpipe in such a way that the top of the safety cage touches the baffle. (See exhibit P-7 whereby the cage's touching the baffle is the procedure adopted by Aircraft Exhaust Systems, Inc.)

10. For the purpose of fastening a tailpipe in the muffler of this make and model of a Cherokee aircraft, a hole must be inserted in the exhaust flange of the muffler. Manufacturers sometimes insert the hole in the exhaust

flange. Other times they leave the insertion of this hole to the installer. (See Exhibit P-7 whereby a manufacturer followed the latter practice.) The installer of the tailpipe must then index and drill a corresponding hole in the tailpipe. After the tailpipe is inserted through the exhaust flange into the muffler, the installer must secure the tailpipe into the exhaust flange with an alignment pin which passes through the two holes (the hole in the exhaust flange and the hole in the tailpipe). Proper placement of the two holes and the insertion of the alignment pin determine whether the safety cage is properly positioned between the end of the exhaust flange and the baffle or is placed too low in the exhaust flange.

11. If the original installer of a new or overhauled tailpipe does not know where to drill the indexing hole in the tailpipe, it is required by FAA regulations that the installer contact the aircraft manufacturer or the tailpipe manufacturer for guidance.

12. The tailpipe that was installed in this case on September 12, 2002, by defendant Caufman came from the manufacturer without the indexing hole drilled into the tailpipe.

13. On September 12, 2002, defendant Caufman aligned the pre-existing hole in the exhaust flange with an indexing hole that he created in the tailpipe. He then secured the tailpipe in the exhaust flange.

14. The exhaust flanges manufactured as part of the mufflers for Cherokee aircraft often vary in length. The diameter of these exhaust flanges is identical on each muffler when it comes from the manufacturer. However, with use, the diameter of the exhaust flanges often changes

to various extents based upon a number of factors such as removing or smoothing welding deformities, removing oxidation, use of pipe expanders for better fits of tailpipes into the exhaust flanges, and clamping of tail pipes for better fits.

15. The Piper Cherokee Service Manual provides that the Cherokee's entire exhaust system must be rigidly inspected at each one hundred hour required inspection.

16. Defendant Caufman also performed maintenance on the Cherokee aircraft for a one hundred hour inspection in 2003. He disassembled the muffler system. He found no cracks. He removed the tailpipe he previously installed, re-lubed it with anti-seize and reassembled the muffler system. The same holes with positioning pin were used in reassembling the tailpipe into the muffler. No problems were found. Defendant returned the Cherokee aircraft to service.

17. On December 29, 2003, April 1, 2004, May 21, 2004, December 4, 2004, February 8, 2005, and March 31, 2005, additional defendant, Kent Heller, inspected the aircraft including the muffler system. On each occasion, he disassembled the muffler and took off the header pipes to gain access to the inside of the muffler. He also removed the tailpipe. He looked into the muffler through the various openings in it. All appeared in order. The baffle was in good shape. While the tailpipe was still fastened in the muffler, Mr. Heller inspected it. The safety cage appeared to be properly engaged on the end of the tailpipe inside the muffler. He did not note any defects with the installation of the tailpipe with its safety cage. He performed each of these inspections in the exact same way, saw the same

things, and reached the same conclusions.

18. A number of malfunctions may cause the loss of power in a Cherokee aircraft which could result in its crashing. The malfunctions include failure of magnetos which fire the aircraft's cylinders, carburetor icing, numerous internal engine catastrophic malfunctions, and inadequate insertion of a tailpipe into a muffler.

19. On September 15, 2004, during an inspection, Mr. Heller discovered a few low compression readings on some cylinders (soft cam shaft). As a result, the engine was torn down and repaired. Necessary parts were replaced and the engine was reassembled.

20. Several days before the crash, there was a problem with one of the aircraft's magnetos. It was replaced. Both magnetos on this aircraft must fail for a catastrophic loss of power.

21. On May 13, 2005, at approximately 11:00 p.m., the Cherokee aircraft experienced engine power loss and crashed into darkness just after take-off from Chandelle E.S.T. Airport, Dover, Delaware, while en route to Lehigh Valley International Airport in Allentown, Pennsylvania. As a result of the collision with terrain, the aircraft was destroyed and rendered into unairworthy salvage. As the plane made its final descent, it went into a nose dive. It then rammed into the ground, with tailpipe protruding from the bottom of the plane and dragging on the ground, before it came to a stop.

22. At the direction of the FAA, Mr. Yialamas had his damaged aircraft, which was in pieces, taken to the

property of his father near Kutztown, Pennsylvania. It was stored there in a secure garage. The muffler and tailpipe were part of the wreckage. The aircraft was then taken from Kutztown to defendant Heller's shop at the direction of FAA. At that shop, it was inspected by an FAA inspector. Among those present for the inspection were Gus Yialamas and Christopher Hilbert who assisted in the retrieval of the damaged aircraft. After the FAA inspector finished his work, the aircraft was released to the exclusive control of Mr. Yialamas. FAA indicated that it had no further use of the aircraft. Parts of the aircraft were removed and used in another plane owned by Mr. Yialamas. What remained of the aircraft, its carcass, was hauled to a salvage yard.

23. Since the time of this litigation, location of the muffler and tailpipe has been unknown. The last time it was seen by anyone connected to this litigation was at the FAA inspection. Mr. Yialamas and others made efforts to locate the muffler and tailpipe, but they were unsuccessful in their efforts. There is no evidence that anyone acted malevolently by discarding or secreting the muffler and tailpipe. Neither defendants, additional defendants, nor anyone on their behalf had the opportunity to inspect the muffler and tailpipe at any point after the plane crash. Plaintiff's expert, Leonard Boyd, also never examined the muffler and tailpipe.

24. When the damaged aircraft was at defendant Heller's shop, Mr. Hilbert, with a new camera, took photographs (these were admitted as trial exhibits) of the aircraft and parts at the direction of Mr. Yialamas. When Mr. Hilbert handled the muffler from the aircraft in Heller's shop at the time of the investigation by the FAA

investigator, there was something loose inside it.

## Discussion and Conclusions of Law

Plaintiff's causes of action for negligence against both defendants are premised on the allegation that defendant Caufman improperly installed the tailpipe on September 12, 2002. According to plaintiff, "[t]he hole that was drilled on the tailpipe by the defendants was improperly drilled at the wrong position which prevented the arch shaped standoff (safety cage) from properly functioning as a failsafe and resulted in the destruction of the aircraft" and damages (amended complaint, paragraph 14). Plaintiff has not proven that Caufman drilled the hole at an improper place on the tailpipe or otherwise improperly positioned the tailpipe with its safety cage inside the muffler. Thus, plaintiff has not proven that Caufman breached any duty by improperly installing the tailpipe.

In establishing its claim for negligence against the original defendants, plaintiff must also present evidence of a causal connection between any negligent conduct in the installation of the tailpipe and damages suffered. See *Cuthbert v. City of Philadelphia*, 417 Pa. 610, 614, 209 A.2d 261, 263 (1965); and *Reilly v. Tiergarten, Inc.*, 633 A.2d 208, 210 (Pa. Super. 1993). The plaintiff must prove that the defendants' conduct actually caused the plaintiff's damages. This is referred to as "factual cause." Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. "An act is a factual cause of an outcome if, in the absence of the act, the outcome would not have occurred." *Gorman v. Costello*, 929 A.2d 1208, 1212 (Pa. Super. 2007). Even if plaintiff proved that

defendant Caufman improperly inserted the tailpipe so that the safety cage was too low in the muffler, plaintiff has not proven that this failure in any way contributed to blockage of the exhaust outlet in the muffler which resulted in loss of power and the crash. The causation element of the negligence causes of action has not been proven by plaintiff against the original defendants.

In an attempt to establish that defendant Caufman was negligent, that is, that he breached a duty to properly install the tailpipe, plaintiff relied upon a qualified expert, Leonard Boyd. Among other qualifications, Mr. Boyd has an A&P mechanic certification and I.A. certification. The opinions expressed by Mr. Boyd were based on a thin premise and were contradicted by other believable evidence on material points.

It was Mr. Boyd's opinion that defendant Caufman improperly installed the tailpipe into the exhaust flange in September of 2002. According to Mr. Boyd, Caufman placed the hole in the tailpipe in such a way that, when it was aligned with the exhaust flange hole and fastened with the alignment pin, it caused the tailpipe to be placed too low in the exhaust flange. According to Mr. Boyd, placement of the tailpipe too low meant that the safety cage attached to the tailpipe was also placed too low. As a result, any displaced objects inside the muffler, including a dislodged baffle, could block the exhaust path through the exhaust flange and tailpipe, prevent exhaust escaping from the muffler, and cause a power loss in the aircraft. By placing the tailpipe with its safety cage too low, the safety cage could not perform its intended function of keeping a failed baffle or other objects from clogging the exhaust

path.

Mr. Boyd had a difficult task in trying to create this scenario for the court. The review of the case by Mr. Boyd followed the violent destruction of the aircraft during which the tailpipe protruded from the bottom of the aircraft and dragged along the ground during the crash. Also, due to the loss of the muffler and tailpipe before litigation began, Mr. Boyd never examined the actual muffler and tailpipe.

During his testimony, Mr. Boyd made it clear that he relied upon the photographs of the muffler and tailpipe taken by Mr. Hilbert after the crash to determine the precise point of the hole placed in the tailpipe by defendant Caufman. Mr. Boyd was asked, "And were you able to determine that position of the hole in the tailpipe by the photographs alone?" Mr. Boyd responded, "yes." He indicated that it would have been "nice" to see the original muffler assembly with tailpipe, "[b]ut I didn't really need it."

Mr. Boyd used the diameter of the exhaust flange as shown in the photographs after the crash to calculate where defendant Caufman placed the hole on the tailpipe for the alignment. As Mr. Boyd stated in response to the question "and the reference point that you used, sir, is what?" Mr. Boyd's answer was, "The diameter, which is a known, with no variable and it established the scale of the picture." Reliance on exhaust flanges that always have the same diameter and scale of one item to another as shown in the photographs were crucial to Mr. Boyd in formulating his opinions.

Mr. Yialamas, the owner of the aircraft, made

calculations based on the photographs. Mr. Boyd, the expert, adopted those calculations to conclude that defendant Caufman placed the hole on the tailpipe at a point which caused improper installation of the tailpipe. There are problems with this approach by Mr. Boyd.

Under the evidence, the diameter of exhaust flanges is not uniform on mufflers that have been in use. They can be altered, albeit slightly, through a variety of factors such as smoothing weld deformities, removing oxidation, and use of pipe expanders and clamping. Although these create slight variations in the diameter of the flanges, Mr. Boyd's assumption was that these diameters are always the same. He used that assumption to determine scale in the photographs. Determination of scale was critical to Mr. Boyd's opinions about improper placement of the hole.

According to Mr. Yialamas, Mr. Hilbert was using his new camera for these photographs. Photographs can be deceiving in terms of the placement of objects. There was no demonstration that precautions were in place to assure that there was no distortion of objects for the precise calculations for which the photos were used. As Mr. Yialamas testified, he had no idea as to the use that would be made in this litigation of the photographs when they were taken by an apparently casual photographer with a new camera.

Mr. Boyd's conclusions were also undermined by persuasive evidence.

Defendant Caufman described in detail how he installed the tailpipe in 2002. He had specific recall of what he did to get the tailpipe into the exhaust flange. He described

the placement of the pipe with its safety cage. Within a year of his first installation, he removed the tailpipe, inspected it, and reinstalled it. From this evidence, I, as fact-finder, cannot say definitively that the tailpipe was installed properly on these two occasions. Nevertheless, it appears Caufman took the proper precautions with the hole alignment and fastening.

The parties acknowledged that additional defendant Heller was an excellent maintenance person for aircraft. Mr. Heller performed several inspections on the aircraft covering the period of late 2003 to March of 2005. These inspections included disassembly of the muffler system. While he probably could not determine the exact placement of the safety cage inside the muffler, he reached the conclusion on each of these inspections that the tailpipe was properly installed into the muffler system from all that he had seen.

There were no occurrences of loss of power in the aircraft caused by the muffler system from the point of the initial installation of this tailpipe in 2002 until the crash in 2005. There were problems with the magneto just days before the crash. There also was the problem with the soft cam shaft in September of 2004 which required some tearing down of the engine and replacing of parts.

Under all of these circumstances, there is insufficient evidence to conclude that defendant Caufman improperly installed the tailpipe in accord with the theory advanced by plaintiff through Mr. Boyd. More convincing is the evidence that he properly installed it based upon his own testimony, the inspections by Mr. Heller, and the

performance of the aircraft since the original installation in 2002.

Even if plaintiff proved that defendant Caufman improperly inserted the tailpipe so that the safety cage was too low in the exhaust flange, plaintiff has not proven that this failure contributed to a blockage of the exhaust path resulting in loss of power and the crash. While the baffle inside the muffler was displaced at some point before or during the crash, the proof is insufficient that it was displaced before the crash or to such an extent that it blocked the exhaust path to cause this crash. There is insufficient evidence to prove that the tailpipe was obstructed at all before the crash.

In view of the fact that plaintiff has not demonstrated improper installation of the tailpipe, the statute of limitations is not an issue. Further, without proof of improper installation, the breach of warranty claims fail. The court does not impose any sanctions upon plaintiff for the spoliation of the muffler and tailpipe. However, production of these would have been instructive for me in my role as fact-finder. Plaintiff has not met its burden of proof on any of its causes of action stated in the amended complaint.

Sadly, there was a plane crash in which people were injured. Unfortunately, plaintiff also suffered financial losses as a result of the destruction of the aircraft. Even after consideration of the evidence from this trial, the cause of this crash remains a mystery.